Kefover et ux. *v.* Potter Title and Trust Company, Appellant.

52

Argued October 8, 1935.   Before Frazer, C. J., Kephart, Schaffer, Maxey, Drew, Linn and Barnes, JJ.

*H. F. Stambaugh,* with him *John M. Freeman,* of *Watson & Freeman,* and *Ralph H. Demmler,* for appellant.

*Mahlon E. Lewis,* with him *Alter, Wright & Barron,* for appellees.

OPINION BY MR. JUSTICE KEPHART, November 25, 1935:

On March 10, 1928, Clark Kefover and his wife transferred to the Potter Title and Trust Company the sum of $25,000 under a trust agreement wherein the trust company agreed to invest the money in first mortgages and remit the income to the Kefovers less taxes and trustee's fees. The agreement provided for revocation by the Kefovers and stated, ". . . the trustee shall have a reasonable time in which to convert the investments in cash." Notice of revocation was sent March 31, 1933, with a request for payment of $10,000 by May and the balance in installments of $5,000 each month. On April 29, the trust company informed the Kefovers that it was unable to make payments as "originally agreed upon" because "it was impossible for many mortgagors to pay their interest and principal." The letter enclosed a check for $2,500 and stated that a "similar amount will be sent monthly until the entire fund is paid." Two more checks in the sum of $2,500 each were sent thereafter, but it failed in the installment due July 31, and, the Kefovers having made demand therefor through their counsel, on August 4, 1933, the trust company

wrote that it was unable to continue making payments due to the fact that the Orphans' Court of Allegheny County had enjoined the trust company from making any further investments in its general mortgage pool. The Kefovers made protest through their counsel and on August 7, 1933, the trust company wrote that if the Kefovers would agree to let the matter rest until October 1, 1933, their rights would not be prejudiced by the delay. On December 15, 1933, a second agreement was entered. The preamble sets forth in brief the facts above mentioned and that the Kefovers have been forced to employ counsel for the purpose of instituting proceedings to enforce payments. It also recites that "the party of the second part [the trust company] is desirous of avoiding litigation in this matter"; that "the party of the second part admits there is due and owing to the parties of the first part the sum of Seventeen Thousand Five Hundred ($17,500) Dollars . . . in accordance with the provisions of the agreement of March 10, 1928, . . ." and, finally, that "the parties hereto are mutually desirous of avoiding litigation and settling the differences now existing between them." The trust company agreed to pay to the Kefovers $500 in cash and $1,000 each month until the sum of $17,500 was paid in full. The Kefovers, on their part, agreed not to bring action while payments were regularly made. The agreement also provided that the Kefovers, "as security for the agreement," were at all times to have their interest in the trust investments in so far as they were not reduced by payments, and also the income therefrom; and that in lieu of payments the Kefovers could at any time accept their participation in the mortgage pool comprising the trust investment. It concluded with a statement that the parties intended to be bound under the provisions of the Uniform Obligations Act.

Under this second agreement payments were made regularly until April 27, 1934, when the trust company informed the Kefovers that the payment due on May 1st

would not be made. In June, 1934, an action of assumpsit was brought by the Kefovers for the installment due on May 1, 1934, and a judgment was secured thereon, which was paid by the Potter Title and Trust Company. The present action, commenced January 3, 1935, was to recover $8,000 which the Kefovers allege is the balance due under the agreement of December 15, 1933, and, from a judgment for want of a sufficient affidavit of defense, the trust company appeals.

A number of very interesting and complex questions are raised by the affidavit of defense, the decision of which depends upon proper consideration and analysis of the contracts and letters. The original agreement provided, "The trustors reserve the right to revoke this agreement in whole or in part at any time by written notice to the trustee and in case they so elect the trustee shall have a reasonable time in which to convert the investments into cash." Had this action been instituted on that contract, appellees might have found themselves in considerable difficulty. Appellant now contends that under it the trustee was only required to pay in cash the amount realized from the investments and that it was to be given a "reasonable time" in which to convert them. Appellees hold that the payment was to be in cash for the full amount originally delivered in trust. In Crick's Est., 315 Pa. 581, where this question arose, the contract, after giving the donor or trustor the right to revoke, reads: ". . . the donor upon such revocation . . . shall not be entitled to payments of funds so withdrawn by him until thirty days after such notice." We held, that, on termination of the trust, the donor could not secure his principal in cash but was required to take his participation certificate in the mortgage pool. In Roberts's Trust Est., 316 Pa. 545, the trust agreement provided that, upon thirty days' notice of revocation, "the trustee shall thereupon pay over . . . the said trust estate in cash . . . together with any income in hand or accrued thereon." The parties did not dispute that

this imposed an obligation on the trustee to pay the entire principal in cash. In Osterling v. Com. Trust Co., 320 Pa. 67, the agreement provided, ". . . and as the first party desires to withdraw funds from the investments under this agreement, the second party (trustee) agrees to pay over the amounts requested to him in cash, and itself to assume the mortgages wherein the funds were invested." This agreement has been held to entitle the trustor to receive the original sum invested in cash.

Under the agreement of 1928 it is, to say the least, debatable as to whether appellant's contention is not correct that the trustors were limited in their right to the amount realized from converting the investments. But when the trust was revoked and appellant and appellees consulted personally and through correspondence, the net result shows an understanding that the 1928 agreement contemplated a return of the entire trust investment in cash.

Appellees call attention, in support of this, to the number of payments that have been made as showing such understanding. Appellant contends, however, that the letters, conversations and payments did not bind them any further than the 1928 agreement, and that the payments and letters were merely expressions of intent or purpose to accommodate the trustors while not departing from that document. However this may be, what does conclusively bind the parties as to what they really intended by the 1928 agreement is the clearly expressed understanding of that agreement as set forth in the 1933 agreement. Therein they definitely state that the meaning of the 1928 agreement was that the trust estate should be paid in cash. Whether the 1933 agreement is an enforceable contract or not, and in whatever light it may be viewed as defining the obligation of the parties, it unquestionably sets forth the intention of the parties as to the trustee's obligation under the 1928 agreement. The construction, interpretation, and meaning of that

contract is concisely supplied by the parties' second contract—it is their own language and is to be considered as though written into the original agreement of 1928. See Restatement, Law of Contracts, Sections 230, 231, 235 (e).

The December 1933 agreement reads, after reciting the original transaction and the various steps thereunder, ". . . the party of the second part admits there is due and owing to the party of the first part the sum of Seventeen Thousand Five Hundred Dollars with the income derived therefrom *in accordance with the provisions of the agreement of March 10, 1928, . . .*" and appellant agrees that it will pay to the appellees the sum of five hundred dollars on the execution of the agreement and one thousand dollars per month beginning January 2, 1934, until the full amount of seventeen thousand five hundred dollars has been paid. These expressions have no reference to the mortgage pool or that the money is to come therefrom or be dependent thereon. The agreement does say that this money is held in trust in the mortgage pool, but that expression is one of identification, not in limitation or control of the intention expressed. The recital of a fact upon the truth of which the execution of a contract is dependent and which, reflecting a joint attitude of mind, is made an integral and essential part of a contract, is conclusive in the absence of mistake sufficient to reform the contract: Altman v. McMillan, 100 N. Y. S. 970, 974; Williston, Contracts (1921), section 115a; cf. Real Estate Co. of Pbg. v. Rudolph, 301 Pa. 502.

Having then the clear and expressed intention of the parties in 1928 to pay in cash the original amount deposited in the trust estate within a "reasonable time" (always an open question), that intention or promise embodied in the original undertaking of 1928 was not, at that time, "inconsistent with the laws of this State" (see the Act of May 29, 1895, P. L. 127) and is not binding on appellant. A trust company, being a trustee of funds

deposited with it for investment, may promise to pay in cash in the absence of a prohibiting statute, and in 1928 such promise was not contrary to law or against declared public policy: Roberts's Trust Est., supra, at 549.

Appellant urges, however, that the December 1933 agreement is void for the following reasons: first, the agreement is without consideration and therefore ineffective; second, it attempts to guarantee the integrity of the trustors' investments in mortgages which it is not permitted by law to do; third, it uses the bank's or depositors' money to stand good for losses occurring in its trust funds by forcing the bank to repurchase at face value depreciated securities held in trust by it for investors. In short, that both guaranty and repurchase are ultra vires and beyond the powers of a banking corporation, and that the agreement of compromise of 1933 did not secure to the trustee a benefit sufficient to estop it from so pleading.

We have already stated that the understanding of the parties expressed through various letters and conversations was that the trust estate in full was to be paid in cash, but the time within which repayment was to be made was still in dispute. Appellees were demanding that the full sum be paid at once, while appellant denied this right fearful of "economic conditions that would not permit it to pay." Any action at law which might have been commenced could well have been defended on this ground, but the parties chose to fix the "reasonable time" as seventeen months by their compromise agreement of 1933. It was unquestionably valid as a compromise for it determined a doubtful question. It is well settled in this State that surrender of a doubtful claim and forbearance to sue thereon is sufficient consideration to support such a contract. See Gormly v. Gormly, 130 Pa. 467; Flegal v. Hoover, 156 Pa. 276; Sutton v. Dudley, 193 Pa. 194; Gaynor v. Quinn, 212 Pa. 362; Miller's Est., 279 Pa. 30. Equally well established, however, is the principle that if the claim foreborne is groundless

and not the subject of doubt it will not serve as consideration. See Huntingdon County v. Spyker's Exr., 274 Pa. 570; Bryant v. Bryant, 295 Pa. 146. In its affidavit of defense, appellant does not assert that any controversy which might have existed was groundless and not the subject of doubt so that a settlement reached on the basis of it would be without consideration, but asserts that no controversy ever existed. This would seem to contravene the recitals set forth in the agreement of December 15, 1933, and appellant cannot now be permitted to do so.

On the subject of guaranty and repurchase as we view the contract before us, it is parallel with or even stronger than that in Roberts's Trust Est., supra, and what was said there applied with equal force here unless Roberts's Trust Estate is overruled. See also Osterling v. Com. Trust Co., supra. As stated therein a guarantee was neither contemplated, nor specified in the deed. The assumption of liability in the instant case was prior to the Act of 1933 (Act of May 15, 1933, P. L. 624, article X, section 1021, and article XI, section 1109B), and, whatever it might prohibit, does not affect the instant relation. The Act of 1933 and any failure there may be to observe its conditions need not be further considered. What might happen if these questions are presented under that act may become very interesting when a proper case arises.

Further, on the question of the ultra vires of the 1933 agreement, we wish to reiterate that the entire transaction must be considered in the light of the expressed intention of the parties in 1928. What appellant was endeavoring to do in December, 1933, was to time the repayment occasioned by revocation of the prior agreement. It prescribes no greater obligation on appellant than did the 1928 agreement as interpreted by them, although it definitely fixes the limit of time for fulfillment of that obligation.

It is argued that, if the 1933 agreement be considered as a new and independent undertaking wherein the obligation to pay cash appears for the first time, still, since it refers to the agreement of 1928 and retains the trust set up by that agreement (even though it may only be as security), it becomes necessary to view the later agreement entirely in the light of the earlier and under it the trust company did not promise to pay. The argument is ingenious but unsound. The agreement of 1933 recites that the sum of $17,500 is due ". . . in accordance with the provisions of the agreement of March 10, 1928, . . ." but this statement has no reference to the mortgage pool nor does it state that payment is to come from its liquidation. Further, no new elements appear in the second agreement that were not present in the first. In the 1928 agreement the trustors deposited with the trustee twenty-five thousand dollars upon an express trust— to invest in first lien mortgages and to remit the income derived therefrom to the trustors. The trustors had the right to revoke. The trustee could not revoke or terminate the trust but must act as trustee until the trustors exercised their option, when the trustee was required to pay in cash the full amount of the trust estate. The agreement created the primary relation of trustee and beneficiary which passed into a debtor and creditor relation when the trustors or beneficiaries exercised the power of revocation. This was clearly within the power of the trust company and is not contrary to the law of trusts. See Restatement, Law of Trusts, section 12, comment "k" and illustration 24 thereto: Roberts's Trust Est., supra. The second agreement created the relation of debtor and creditor with the trust relation created in the first agreement coexisting as security for the debt. These relations do not violate the law of trusts (cf. Restatement, Law of Trusts, section 12, illustration 20), and were expressly contemplated by the 1928 agreement. The trustors having revoked, the second agreement is

merely the outcome or result of the prior agreement, and neither the relations nor the agreement of 1933 raise appellant's obligation any higher than originally intended. The relation of debtor and creditor was not initially effected in 1933 and hence would not impale the 1933 agreement, or, through it, the 1928 agreement, on the horns of the Act of 1933. The parties in 1933 simply wrote out the scope of liability under the 1928 contract which originally had contemplated a shifting of relations. The most that could happen under the 1933 contract would be to strike down the security or trust relation, but as appellees had the benefit of it when the 1928 contract was made there is no legal reason which would compel them to let go of it, even if a debtor and creditor relation was permanently established.

Equally untenable is the argument that the order of the Orphans' Court of Allegheny County prohibits the trust company from fulfilling its contract. That order appoints a receiver for the mortgage pool and prohibits disbursements to any of its participants. Whether the order is valid or invalid, it does not seek to interfere with the engagements of the trust company. While it does prohibit payments from the proceeds of the mortgage pool, it does not forbid the transfer and purchase of interests in the pool, nor does it forbid the repayment of a participant in the pool by the trust company from its own funds. Hence the trust company's performance of its obligation will neither violate nor circumvent the order of the orphans' court.

We hold that the court did not commit error in granting judgment for want of a sufficient affidavit of defense. The other questions raised need not be discussed.

Judgment affirmed.